**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  SEP 0 1 2021  ★

BROOKLYN OFFICE

DCP:DG/BW
F. #2017R01904

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ROBERTO GUSTAVO CORTES RIPALDA,
FERNANDO HABERER BERGSON and
ERNESTO HERACLITO WEISSON PAZMINO,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

INDICTMENT

CR 21 - 458
Cr. No.

(T. 18, U.S.C., §§ 982(a)(1),
982(a)(2), 982(b)(1), 1349, 1956(h)
and 3551 et seq.; T. 21, U.S.C.,
§ 853(p))

**GUJARATI, J.**

THE GRAND JURY CHARGES:

**BULSARA, M.J.**

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    Background - The Defendants and Relevant Individuals and Entities

1.    The defendant ROBERTO GUSTAVO CORTES RIPALDA

("ROBERTO CORTES" or "CORTES") was a citizen of the United States and Ecuador and a

resident of the United States.

2.    The defendant FERNANDO HABERER BERGSON ("FERNANDO

HABERER" or "HABERER") was a citizen of Uruguay and Germany and a resident of

Argentina.

3.    The defendant ERNESTO HERACLITO WEISSON PAZMINO

("ERNESTO WEISSON" or "WEISSON") was a citizen of the United States and Ecuador and a

resident of the United States.

1

4.      Biscayne Capital was a business founded in or around 2005 by the defendants ROBERTO CORTES and ERNESTO WEISSON to provide financial services to clients based primarily in Latin America. The defendant FERNANDO HABERER joined Biscayne Capital as a financial advisor in 2009. In or about and between 2005 and 2018, CORTES and WEISSON operated Biscayne Capital from Miami, Florida through a series of different corporate entities, the identities of which are known to the Grand Jury, which were incorporated at various times in the United States, Uruguay, Bermuda, Switzerland, the British Virgin Islands and the Bahamas (collectively, "Biscayne Capital" unless otherwise specified). Among the entities that CORTES, HABERER and WEISSON used to operate Biscayne Capital were a Delaware holding company and a Florida-based entity that was formed in or around 2008 in Miami as a United States-registered investment advisor. In or about 2012, the Florida entity deregistered as an investment adviser, and Biscayne Capital incorporated a new holding company in Bermuda. In or about 2016, CORTES and WEISSON divested ownership of Biscayne Capital and its related entities into trusts, the identities of which are known to the Grand Jury. Notwithstanding the divestitures, CORTES, HABERER and WEISSON continued to exercise operational control over Biscayne Capital through in or about September 2018 through consulting agreements with the trusts. At times relevant to this Indictment, Biscayne Capital maintained offices in, among other places, Florida, Ecuador, Argentina, the Bahamas and Uruguay.

5.      Gustavo Trujillo was a citizen of Ecuador who resided in Florida beginning in or about May 2018. In or about and between 2007 and 2018, Trujillo was employed in operational and comptroller positions in the Ecuadorian and Argentinian offices of Biscayne Capital.

6.     Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a citizen of Ecuador and a resident of the United States.  In or about and between 2005 and 2017, Co-Conspirator 1 worked primarily in operational positions for Biscayne Capital.  Co-Conspirator 1 was a close relative of the defendant ROBERTO CORTES.

7.     South Bay Holdings, LLC was a business based in Florida and founded by the defendants ROBERTO CORTES and ERNESTO WEISSON to develop luxury real estate in Florida.  South Bay Holdings and its related entities (collectively, "South Bay") were beneficially owned and operated by the defendants CORTES and WEISSON in or about and between 2005 and 2018.  Beginning in or about 2009, South Bay made equity investments in Biscayne Capital.  By in or about 2012, South Bay was Biscayne Capital's majority shareholder.

8.     Proprietary Products were several private investment products issued from the Cayman Islands and Ireland that were owned by or created at the direction and to the ultimate benefit of the defendants ROBERTO CORTES and ERNESTO WEISSON, and were marketed and sold to Biscayne Capital clients by CORTES, WEISSON, the defendant FERNANDO HABERER and others.  ORC Senior Secured Limited ("ORC"), GMS Global Step Up Note Limited ("GMS") and IA Capital Structures ("IA Capital") were entities that issued Proprietary Products.  The first Proprietary Products were created in or about 2006.

9.     Madison Asset LLC ("Madison") was a company incorporated in the Cayman Islands in or about 2014.  Madison had bank accounts in the United States and Europe, including accounts in New York, New York.  In or about December 2015, the defendants ROBERTO CORTES, ERNESTO WEISSON and FERNANDO HABERER made Trujillo the nominal owner of Madison through a United Kingdom shell company that was owned and

controlled by Trujillo. CORTES, WEISSON and HABERER, through Trujillo, used Madison's

bank accounts to send and receive cash and securities that had been invested in Biscayne Capital.

10.     Broker-Dealer, a company the identity of which is known to the Grand

Jury, was a registered broker-dealer and investment advisor based in Highland Park, Illinois.

11.     Financial Institution 1, a bank the identity of which is known to the Grand

Jury, was a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC")

and based in New York, New York.

12.     Financial Institution 2 (together with Financial Institution 1, the "Financial

Institutions"), a bank the identity of which is known to the Grand Jury, was a financial institution

insured by the FDIC and based in St. Petersburg, Florida.

13.     Client 1, an individual based in Andorra whose identity is known to the

Grand Jury, was a client of Biscayne Capital. Client 1 owned financial advisory companies

based in Andorra and Belize. Client 1 invested in Proprietary Products through Biscayne Capital

on behalf of himself and his clients.

14.     Client 2, Client 3, Client 4, Client 5, Client 6, Client 7 and Client 8,

individuals whose identities are known to the Grand Jury, were clients of Biscayne Capital.

II.     The Fraudulent Scheme

A.     Overview

15.     In or about and between August 2013 and April 2018, the defendants

ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, together with

others, conspired to defraud Biscayne Capital clients and the Financial Institutions through a

series of material misrepresentations and omissions. First, the defendants and their co-

conspirators falsely represented to some Biscayne Capital clients that the clients' investments in

Proprietary Products would be used to finance the development of South Bay's projects when, in fact, their investments were instead used to, among other things, pay other Biscayne Capital clients. Second, the defendants and their co-conspirators invested certain of Biscayne Capital clients' funds in Proprietary Products without their knowledge, and provided those Biscayne Capital clients with fraudulent account statements that showed false investments and returns. Third, the defendants and their co-conspirators fraudulently induced banks, including the Financial Institutions, to extend credit to Biscayne Capital client accounts and then used that credit to further the scheme. Fourth, in part to repay banks, including Financial Institution 1, for the credit the defendants and their co-conspirators fraudulently obtained, HABERER sent forged letters of authorization directing Broker-Dealer to transfer securities out of Biscayne Capital client accounts.

16.     With full knowledge that Biscayne Capital was on the verge of collapse, the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, together with others, used the funds they misappropriated and fraudulently obtained from Biscayne Capital clients and the Financial Institutions to perpetuate and conceal the fraudulent scheme by, among other things, (a) making interest and principal payments owed to other Biscayne Capital clients and (b) making payments to individuals affiliated with Biscayne Capital, including owners, employees and financial advisors.

17.     Ultimately, in or about September 2018, the scheme collapsed, and Biscayne Capital went into liquidation, resulting in losses of more than $155 million to Biscayne Capital clients, including at least $40 million in losses to Clients 1 through 6. Meanwhile, over the course of the scheme, the defendants ROBERTO CORTES, FERNANDO HABERER and

ERNESTO WEISSON paid themselves millions of dollars from funds that their clients had invested with Biscayne Capital.

B.    Misrepresentations to Fraudulently Induce Investments in Proprietary Products

18.    In or about 2005, the defendants ROBERTO CORTES and ERNESTO WEISSON, together with others, began operating Biscayne Capital. In or about 2006, CORTES and WEISSON created and began marketing Proprietary Products. Biscayne Capital sold investments in Proprietary Products to clients of Biscayne Capital for the stated purpose of, among other things, raising funds to develop South Bay's real estate projects in Florida.

19.    In or about 2007, South Bay's projects began suffering financial difficulties that worsened over the next decade. South Bay's liabilities increased from approximately $22.5 million at the end of 2007 to over $130 million by the end of 2012.

20.    As South Bay's financial difficulties worsened, Biscayne Capital's ability to pay outstanding interest and principal debt obligations to investors in Proprietary Products using South Bay profits decreased. As a result, Biscayne Capital relied increasingly and primarily on obtaining new investments in Proprietary Products, which the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON and their co-conspirators regularly misappropriated to repay investors. This was done, in part, to deceive clients into believing that their investments were safe and generating returns, when in fact the vast majority of their money was not being used to develop real estate and was not generating returns.

21.    In or about April 2016, the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, together with others, fraudulently obtained approximately $5 million in investments from Client 1 in Proprietary Products through

6

a series of false representations about how Client 1's funds would be invested, the expected

return on the investment and how the investment would be secured. Client 1 ultimately lost

approximately $4.7 million of the money he invested (on behalf of himself and his clients) in

Proprietary Products because of the co-conspirators' scheme.

22.     Specifically, on or about March 15, 2016, a Biscayne Capital employee

whose identity is known to the Grand Jury, emailed Client 1 an investment document relating to

an investment in a Proprietary Product called IACAP-Select. The defendants ROBERTO

CORTES and ERNESTO WEISSON, Co-Conspirator 1 and others were copied on the email.

On or about the same day, Co-Conspirator 1 emailed Client 1 additional investment documents

related to the same Proprietary Product investment. The investment documents marketed a safe,

fixed-income real estate investment paying quarterly interest of 6.5% over a three-year term.

One of the investment documents provided to Client 1 represented that the investment would "be

utilised to develop, with a view to eventually selling" certain real estate owned by South Bay.

23.     The investment documents contained numerous false and misleading

representations and omissions. For example, the investment documents represented that Client

1's investment would be secured by a "first mortgage on the houses." This representation was

false because the specified properties were already subject to a recorded first mortgage. In or

about 2013, the defendants ROBERTO CORTES and ERNESTO WEISSON executed a first

mortgage on the same properties with a separate lender ("Lender 1"), an entity the identity of

which is known to the Grand Jury, in connection with a loan to South Bay and its related entities.

Moreover, the investment documents failed to disclose that, in or about 2013, soon after

executing the recorded first mortgage in favor of Lender 1, CORTES and WEISSON also made

false statements to other Biscayne Capital clients that their investments in a different Proprietary Product would also be secured by a first mortgage on the same properties.

24.    In addition, the investment documents falsely stated that Client 1's investment funds would be used to develop specific real estate properties. The defendants ROBERTO CORTES and ERNESTO WEISSON also made this false statement to Client 1 in oral presentations. In reality, however, none of Client 1's investment funds were used to develop properties. Instead, the co-conspirators directed Client 1's investment funds to a Madison bank account operated by Trujillo and used the funds to, among other things, pay themselves and other Biscayne Capital clients.

25.    In total, in or about and between April 7, 2016 and April 21, 2016, Client 1 invested $4,945,000 with Biscayne Capital, including $2,195,000 in the IACAP-Select Proprietary Product. Client 1 funded his Biscayne Capital investments with a series of transfers from accounts at banks outside the United States to a Biscayne Capital-controlled Madison account at Financial Institution 1 in New York, New York and to a Biscayne Capital account at a bank in the Bahamas.

26.    Despite representations to Client 1 that his investment in the IACAP-Select Proprietary Product would be used to develop real estate, in or about and between April 11 and April 22, 2016, Trujillo, who operated the Madison bank accounts at Financial Institution 1 at the direction of the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, misappropriated the funds received from Client 1. Trujillo used the entire $2,195,000 invested by Client 1 in the IACAP-Select Proprietary Product to purchase different Proprietary Products issued by ORC and GMS Global Step Up Note Limited ("GMS") by transferring $2,195,000 from the Madison bank account designated for the IACAP-Select

Proprietary Product to a separate Madison bank account designated for GMS and ORC. Those

funds were then used to make payments to other Biscayne Capital clients.

C.      Tracking of the Fraudulent Use of Investor Funds

27.      To secretly document and track decisions they made regarding where to

direct Biscayne Capital client funds, including the misappropriation of client funds to pay other

clients, the defendant FERNANDO HABERER created Gmail accounts using pseudonyms for

himself, the defendants ROBERTO CORTES and ERNESTO WEISSON, and Co-Conspirator 1

so that the co-conspirators could access a spreadsheet saved on a shared Google drive (the

"Cashflow Spreadsheet"). On or about August 5, 2015, HABERER sent the usernames and

corresponding passwords for these accounts in a WhatsApp chat message to Trujillo, referring to

the "shared gmail."

28.      In the spreadsheets that the defendants ROBERTO CORTES,

FERNANDO HABERER and ERNESTO WEISSON and others maintained, including the

Cashflow Spreadsheet, the co-conspirators tracked incoming funds from Biscayne Capital clients

and the use of those funds. The spreadsheets recorded the use of new client funds to pay interest

and principal owed to other clients and the salaries of CORTES, HABERER and WEISSON,

among other expenses.

29.      For example, in April 2016, the Cashflow Spreadsheet reflected total

inflows of approximately $20.1 million, including Client 1's investments of $4,945,000 and

approximately $14.8 million in additional investments in Proprietary Products from other

Biscayne Capital clients. Prior to these inflows, the bank accounts into which these investment

funds were deposited had balances close to zero. In April 2016, the Cashflow Spreadsheet

reflected total outflows of approximately $19.9 million, including approximately $16,016,887 in

payments to Biscayne Capital clients for amounts owed on Proprietary Product investments and approximately $127,082 in salary payments to the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON. In other words, CORTES, HABERER, WEISSON and their co-conspirators used nearly all of the money that Client 1 and other clients invested in Proprietary Products in April 2016 to pay other Biscayne Capital clients' outstanding interest and principal owed on Proprietary Product investments.

30.     The Cashflow Spreadsheet covered the time period from in or about August 14, 2015 through July 8, 2016, and reflected total inflows of approximately $107 million and total outflows of approximately $109 million. The $107 million of inflows included over $51.7 million in Biscayne Capital client investments in Proprietary Products and over $34 million in fraudulently obtained loans from client accounts at various banks, including Financial Institution 1 and Financial Institution 2 (discussed below in Section II.D). The $109 million of outflows included over $53.9 million in payments to Biscayne Capital clients for amounts owed on Proprietary Product investments; over $28.1 million returned to banks, including Financial Institution 1 and Financial Institution 2, to cover overdrafts in client accounts that were the result of movements of funds in furtherance of the scheme; and more than $1.8 million in salary payments to the defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON.

D.     Communications Among the Conspirators

31.     The defendants ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, and other co-conspirators, regularly discussed where to direct the misappropriated client funds through WhatsApp electronic chat messages, both as a group and in individual chats between certain of the defendants and their co-conspirators.

32.    For example, on or about April 8, 2016, the defendant FERNANDO

HABERER and Trujillo discussed in a WhatsApp chat the misappropriation of Client 1's

investment in Proprietary Products to pay interest owed to other Biscayne Capital clients:[1]

| | |
|---|---|
| Trujillo: | The little cash chart from yesterday is missing something very important |
| Trujillo: | We paid interest[] with [Client 1's] entry from yesterday |
| Trujillo: | Now that it's back, we're doing well. |
| HABERER: | Ok. |

33.    On or about March 13, 2017 – in a group chat that included the defendants

ROBERTO CORTES, FERNANDO HABERER and ERNESTO WEISSON, Trujillo and Co-

Conspirator 1 – CORTES, HABERER and Co-Conspirator 1 discussed the dire financial state of

their business enterprises and the need for cash:

| | |
|---|---|
| CORTES: | Understand that between now and Friday, they're going to link me personally to Biscayne and [Proprietary Product issuer] and South Bay for money laundering in Ecuador. . . . And you're telling me that you don't have the 20K that I've been asking for weeks???? . . . . |
| HABERER: | As I discussed with [Co-Conspirator 1] today . . . let's make a strategy about where it can come from . . . . we're not magicians and we all have to agree . . . . |
| CORTES: | We've always handled things as part of all of the problems for the sake of knowing how to prioritize things.  I stepped to one side so that you and Ernesto [WEISSON] could manage priorities. |
| HABERER: | I repeat, I don't know anything about what's being done with properties, or with the other assets of the trust.  All I see is [Biscayne Capital entities] and debts.  That's why . . . since last year I've [been] telling you that you have to get involved; otherwise, we won't make it. |

---

[1] Unless noted otherwise, the communications between the defendants and their co-conspirators
herein have been translated from Spanish.

| CORTES: | To decide what to pay and what to postpone. Something that we've been doing as a group for over 10 years. . . . |
|---|---|
| HABERER: | Let's work to change things because if not, the boat will sink . . . . Believe me, when there's room I'll perform magic . . . |
| Co-Conspirator 1: | This is a critical moment. Emergency. All of us have to understand where the patient is bleeding from and all agree where to put the bandage. If the bandages don't work, we should come to a consensus as to what sacrifices to make. We've done it before and we've gotten ahead. |

34.     On or about January 12, 2018, the defendant ROBERTO CORTES

emailed Trujillo and the defendants ERNESTO WEISSON and FERNANDO HABERER, and

copied Co-Conspirator 1, regarding a discussion with Client 1: "[Client 1] called me today and

told me that Monday he is sending a document and report to the prosecutor's office in the

Bahamas for fraud and disappearance of investments. He is also personally making a claim with

FINCEN in the USA. He said that it is impossible to deal with people that are hiding and do not

answer emails. . . I am letting you know to see if anyone is interested in doing something about

this."

E.     Fraudulent Account Statements

35.     As described above, the defendants ROBERTO CORTES, FERNANDO

HABERER and ERNESTO WEISSON, together with others, invested Biscayne Capital client

funds in Proprietary Products and then used that money to, among other things, pay other

Biscayne Capital clients. In some cases, the co-conspirators did not disclose to their clients that

they had invested in Proprietary Products, and instead provided clients, including Client 2, Client

3 and Client 7, with false documents purporting to show that the clients' funds were invested in

diversified and healthy investment portfolios that were generating returns. The co-conspirators

sent fraudulent account statements to misrepresent the true status of the clients' investments, conceal their fraudulent conduct, prevent withdrawals and induce new investments.

36.     For example, on or about January 12, 2016, the defendant FERNANDO HABERER emailed Client 3 a document purporting to be an account statement from Financial Institution 1 for one of Client 3's investment accounts as of December 31, 2015. The statement falsely showed that Client 3 had approximately $5.8 million in cash invested in a money market account and only $200,000 invested in a Proprietary Product. In reality, Client 3's account at Financial Institution 1 had only approximately $115,316.48 in a money market account and approximately $5.9 million invested in Proprietary Products. In addition to falsifying the portfolio holdings, the false statement that HABERER sent to Client 3 deleted the name and contact information for the Financial Institution 1 officer responsible for the account and several pages of transaction details, both of which appeared in the legitimate account statement issued by Financial Institution 1.

37.     In another example, on or about January 15, 2018, the defendant FERNANDO HABERER emailed Client 2 a spreadsheet purporting to reflect approximately $20 million in cash and non-Proprietary Product investments in an account at a financial institution based in Switzerland (the "Swiss Brokerage Account"), the identity of which is known to the Grand Jury. The spreadsheet that HABERER sent Client 2 did not disclose any investments in Proprietary Products. In reality, almost all of Client 2's funds in the Swiss Brokerage Account were invested in Proprietary Products at that time.

38.     Trujillo also created and sent numerous false account statements to Client 7 at the direction and with the knowledge of the defendant ROBERTO CORTES. These false statements purported to reflect that Client 7's account at Financial Institution 1 held cash when in

13

fact the co-conspirators had used cash in Client 7's account to purchase Proprietary Products. For example, on or about January 6, 2016, Trujillo sent CORTES an email attaching a draft of a falsified account statement for Client 7, writing to CORTES that the attachment was "for your review." Shortly thereafter, CORTES responded to Trujillo: "It's ok. Send to him." On or about the same day, Trujillo sent an email to Client 7, copying CORTES and attaching the falsified bank statement. In or about March 2017, after Trujillo had sent Client 7 several false bank statements, Client 7 funded his account at Financial Institution 1 with more than $300,000, which the co-conspirators then used to purchase Proprietary Products.

      F.    <u>Fraudulently Induced Loans</u>

      39.    Starting in or about 2015, the defendants ROBERTO CORTES, FERNANDO HABERER, ERNESTO WEISSON and others fraudulently obtained access to short term credit from financial institutions at which they maintained accounts for Biscayne Capital clients by, among other things, falsely representing to banks that they had secured buyers for Proprietary Products, when they had not. In reliance on these misrepresentations, the banks loaned funds to the Biscayne Capital clients' accounts. CORTES, HABERER, WEISSON and others then used this fraudulently obtained credit to pay other investors, cover Biscayne Capital expenses and pay the salaries of CORTES, HABERER and WEISSON.

      40.    As described above, the Cashflow Spreadsheet maintained by the defendants ROBERTO CORTES, FERNANDO HABERER, ERNESTO WEISSON and their co-conspirators tracked the fraudulently obtained bank loans (which the defendants referred to as "overdrafts" in client accounts) as "inflows" of funds that they could use to pay immediate cash needs, including payments to clients and payment of salaries and expenses. The spreadsheet also tracked amounts paid back to the banks to cover outstanding loan obligations as "outflows."

From in or about and between August 14, 2015 and July 8, 2016, the Cashflow Spreadsheet reflected approximately 27 separate inflows of fraudulently obtained loans totaling over $34 million.

41.     The defendants ROBERTO CORTES, FERNANDO HABERER, ERNESTO WEISSON and their co-conspirators discussed their creation and use of overdrafts in client accounts to cover cashflow needs in WhatsApp chat messages. For example, on or about February 9, 2016, Trujillo told HABERER: "I already covered Bahamas' overdraft. Let's wait one or two weeks to do it again. Let me know if that's ok with you." HABERER responded: "Ok."

42.     On or about April 29, 2016, an assistant of the defendant FERNANDO HABERER emailed Financial Institution 2, copying Trujillo, and attached orders for the account of Client 8 to buy $1 million of a Proprietary Product issued by ORC and to sell $1 million of a different Proprietary Product issued by IA Capital. The orders falsely represented that there was a counterparty ready to purchase IA Capital securities. In reliance on this false representation, Financial Institution 2 provided $1 million of credit to Client 8's account for the purchase of ORC securities on or about May 2, 2016. Rather than purchase the securities, the co-conspirators used those funds to pay the salaries of HABERER and the defendants ROBERTO CORTES and ERNESTO WEISSON, as well as to make payments to other Biscayne Capital clients. On or about May 2, 2016, Co-Conspirator 1 sent a WhatsApp message to Trujillo regarding the status of the fraudulently obtained credit: "Please take care of the overdraft so we can see if the salaries can be paid." Trujillo responded to Co-Conspirator 1: "Tomorrow, payment of salaries."

43.     On or about June 24, 2016, the defendant FERNANDO HABERER instructed Trujillo in a WhatsApp message to cause an overdraft in a client's account to pay a Biscayne Capital employee: "Gus, overdraft [Financial Institution 1] and pay [Biscayne Capital employee]."

44.     On or about January 4, 2017, the defendant FERNANDO HABERER instructed Trujillo to create an overdraft at Financial Institution 1 in a WhatsApp message, concluding the message by telling Trujillo "we have to gamble on something." Trujillo responded to HABERER: "On overdraft of [Financial Institution 1]"; "We go to hell".

45.     On or about May 3, 2017, the defendant FERNANDO HABERER wrote to the members of a group chat that included the defendants ERNESTO WEISSON and ROBERTO CORTES: "You should see that there's an overdraft of $1 mm in [a client account at a U.S. bank] . . . We're juggling things around . . . . If we don't all get organized, as a group, we're going to end up with nothing."

46.     On or about and between May 18, 2017 and May 19, 2017, the defendants FERNANDO HABERER and ROBERTO CORTES discussed the status of an overdraft on a group chat that also included the defendant ERNESTO WEISSON:

| | |
|---|---|
| HABERER: | For your information I am effectively as of today at 100% in my accounts and also we have 2mm overdrafts which at any moment we can end up without a relationship in [three different banks] . . . |
| HABERER: | So they'll know the state of the situation. We're overdrawn today by 4mm |
| CORTES: | Basically, I understand that no dividends have been paid for months. And nothing has been invested in assets. And the deficit for operational expenses from [Biscayne Capital] is low. Therefore, the majority of this has been lowering the debt/no net increase. Who's been paid so much? Those are the things I'd like to see and understand here next week. |

16

47.     In or about January 2018, after having invested more than $8 million in Proprietary Products on behalf of Client 3 and sent Client 3 false bank statements covering up these investments, the defendant FERNANDO HABERER, together with others, caused Financial Institution 1 to lend more than $12 million to a custody account (the "Client 3 Custody Account") at Financial Institution 1 that was opened for the ultimate benefit of Client 3 and his family and over which HABERER had trading authority. Specifically, HABERER instructed Financial Institution 1 to execute multiple sales of Proprietary Products in the Client 3 Custody Account and fraudulently represented to Financial Institution 1 that there were counterparties that would purchase those securities. In fact, no such counterparties existed.

48.     Relying on the proceeds that the sales of Proprietary Products would have generated, Financial Institution 1 extended credit to the Client 3 Custody Account to purchase additional Proprietary Products. The defendant FERNANDO HABERER and others then used the majority of the funds lent by Financial Institution 1 to pay down overdraft positions in other Biscayne Capital client accounts at other financial institutions.

49.     Specifically, on or about January 3, 2018, the defendant FERNANDO HABERER sent the defendant ERNESTO WEISSON a WhatsApp message, which HABERER later sent to Trujillo, describing how HABERER and Trujillo had invested Biscayne Capital client funds primarily in Proprietary Products and caused overdrafts in client accounts. HABERER wrote that "if we don't have air from something quick . . . we are going to be ruined."

50.     The following day, on or about January 4, 2018, the defendant FERNANDO HABERER and Trujillo falsely represented to Financial Institution 1 that there was a counterparty ready to purchase approximately $5.5 million worth of Proprietary Products.

Relying on this false representation, Financial Institution 1 advanced approximately $5.4 million to the Client 3 Custody Account for the purchase of additional Proprietary Products. The purchases were made but, because there were no counterparties to buy Proprietary Products, the sales were not.

51.     Approximately one week later, on or about January 11, 2018, the defendant FERNANDO HABERER and Trujillo obtained an additional approximately $6.9 million from Financial Institution 1 for the Client 3 Custody Account by making the same misrepresentations about the existence of counterparties purportedly willing to purchase Proprietary Products. As a result of these misrepresentations about the existence of counterparties, the Client 3 Custody Account was overdrawn by approximately $12 million.

52.     On or about January 31, 2018, the defendant FERNANDO HABERER told Trujillo via WhatsApp message: "I do not know how we went from 5mm to 16.5mm overdraft . . . and everything on my accounts . . . Everything is fucked, completely blocked, and one step away from collapse . . ."

53.     After fraudulently obtaining funds from Financial Institution 1, the defendant FERNANDO HABERER and others provided representatives of Financial Institution 1 a series of false explanations as to why the sales of Proprietary Products had not been executed. For example, in or about January 2018, HABERER falsely told representatives of Financial Institution 1 in New York, New York that Biscayne Capital was having problems with the original counterparty to the purported sale and had found a new counterparty in the United States to purchase the securities, which was false. There never was an original counterparty. Relying on HABERER's statements, Financial Institution 1 twice extended the settlement date for the trades.

54.     In or about early March 2018, Financial Institution 1 employees, some of whom were located in New York, New York, communicated with the defendant FERNANDO HABERER via email and telephone, including emails and telephone calls that travelled through the Eastern District of New York, regarding the unsettled trades from the Client 3 Custody Account.  For example, on or about March 1, 2018, a Financial Institution 1 employee, an individual whose identity is known to the Grand Jury, emailed HABERER asking to set up a call for the purpose of "discuss[ing] the [Client 3 Custody Account] failing trades[.]"  Shortly thereafter, HABERER spoke with Financial Institution 1 employees and agreed to send assets to cover the overdraft.

G.     False Letters of Authorization

55.     In part to provide assets to repay Financial Institution 1's loan to the Client 3 Custody Account, the defendant FERNANDO HABERER and others fraudulently caused securities to be transferred from an account at Broker-Dealer for which Client 3 was the ultimate beneficial owner (the "Broker-Dealer Account") to the Client 3 Custody Account through forged letters of authorization.

56.     Specifically, on or about March 8, 2018 and March 15, 2018, the defendant FERNANDO HABERER and others caused letters of authorization to be sent to Broker-Dealer that contained forged signatures purporting to authorize transfers out of the Broker-Dealer Account.  The letters of authorization were purportedly from representatives of a trustee that managed Client 3's funds.  In reality, the trustee's representatives did not sign the letters of authorization or otherwise authorize the transfers out of the Broker-Dealer Account.

57.     In reliance on the false letters of authorization, Broker-Dealer transferred approximately $5 million worth of securities out of the Broker-Dealer Account.  Approximately

$4 million of those securities were transferred to the Client 3 Custody Account at Financial Institution 1 and used to pay down the $12 million fraudulently induced loan from Financial Institution 1 to the Client 3 Custody Account. The other approximately $1 million in securities were transferred to Madison's account in Belgium, which was controlled by the defendant FERNANDO HABERER and Trujillo, and then liquidated.

58.     The defendant FERNANDO HABERER used similar methods to misappropriate funds from other Biscayne Capital clients. For example, in or about and between October 2017 and November 2017, HABERER and others caused three fraudulent letters of authorization to be provided to Broker-Dealer requesting that Broker-Dealer transfer securities worth more than $1 million from Client 4's accounts at Broker-Dealer to "my own account with Madison Advisors." In fact, Client 4 did not have an account at Madison Advisors and the securities were transferred to Madison's account in Belgium. HABERER and Trujillo then sold the majority of those securities.

59.     In or about March 2018, the defendant FERNANDO HABERER again used fraudulent letters of authorization to misappropriate funds from Client 5 and Client 6 to repay a loan HABERER and others fraudulently induced Financial Institution 1 to make to the Client 3 Custody Account. Specifically, on or about March 14, 2018, HABERER suggested, via a WhatsApp message to Trujillo, using $500,000 from a different client to repay the loan. Trujillo responded, in part, that money the conspirators had recently received had already been used. Later that day, HABERER sent Trujillo information for accounts held for the benefit of Client 5 and Client 6 at a financial institution based in New Jersey (the "Clearing Firm"), the identity of which is known the Grand Jury, and asked Trujillo to "enter into the [Clearing Firm]

20

system to get the signature[s] of these two accounts." The following day, Trujillo sent HABERER an image of Client 6's signature.

60.     On or about March 15, 2018, the defendant FERNANDO HABERER caused letters of authorization to be provided to Broker-Dealer requesting transfers of securities worth more than $2 million from accounts at Broker-Dealer that were for the ultimate benefit of Client 5 and Client 6. Specifically, HABERER provided Broker-Dealer with transfer instructions that contained forged signatures – including the same signature for Client 6 that Trujillo had sent HABERER the previous day – and falsely claimed that the securities were to be sent to Financial Institution 1 accounts in the same names as the Broker-Dealer account for Client 5 and Client 6. In fact, the securities were sent either (i) directly to the Client 3 Custody Account at Financial Institution 1 or (ii) to Madison's account in Belgium, which was controlled by HABERER and Trujillo. The securities transferred from the Client 5 and Client 6 accounts at Broker-Dealer were subsequently used to further repay Financial Institution 1 for the loan HABERER and others had fraudulently induced Financial Institution 1 to make to the Client 3 Custody Account.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

61.     The allegations contained in paragraphs one through 60 are realleged and incorporated as if fully set forth in this paragraph.

62.     In or about and between August 2013 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERTO GUSTAVO CORTES RIPALDA, FERNANDO HABERER BERGSON and ERNESTO HERACLITO WEISSON PAZMINO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors

in Biscayne Capital, and to obtain money and property from them by means of one or more

materially false and fraudulent pretenses, representations and promises, and for the purpose of

executing such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and sounds,

contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Commit Bank Fraud)

63.     The allegations contained in paragraphs one through 60 are realleged and

incorporated as if fully set forth in this paragraph.

64.     In or about and between August 2015 and April 2018, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ROBERTO GUSTAVO CORTES RIPALDA, FERNANDO HABERER BERGSON

and ERNESTO HERACLITO WEISSON PAZMINO, together with others, did knowingly and

intentionally conspire to devise a scheme to defraud the Financial Institutions and to obtain

money, funds, credits, assets, securities and other property owned by, or under the custody or

control of, the Financial Institutions by means of one or more materially false and fraudulent

pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

22

## COUNT THREE
(Conspiracy to Commit Money Laundering)

65.   The allegations contained in paragraphs one through 60 are realleged and incorporated as if fully set forth in this paragraph.

66.   In or about and between August 2013 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERTO GUSTAVO CORTES RIPALDA, FERNANDO HABERER BERGSON and ERNESTO HERACLITO WEISSON PAZMINO, together with others, did knowingly and intentionally conspire to transport, transmit and transfer a monetary instrument and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE AND TWO

67.   The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offenses, to forfeit any property constituting or derived from, proceeds obtained directly or indirectly as a result of such offenses.

68.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

23

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

      (Title 18, United States Code, Sections 982(a)(2) and 982(b)(1); Title 21, United

States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNT THREE

      69.    The United States hereby gives notice to the defendants that, upon their

conviction of the offense charged in Count Three, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), which requires any person

convicted of such offense to forfeit any property, real or personal, involved in such offense, or

any property traceable to such property.

      70.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

24

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DEBORAH L. CONNOR
CHIEF
MONEY LAUNDERING AND
ASSET RECOVERY SECTION
CRIMINAL DIVISION

_____
JOSEPH S. BEEMSTERBOER
ACTING CHIEF
FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

F. #2017R00930
FORM DBD-34
JUN. 85

No. _____

---

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

---

## THE UNITED STATES OF AMERICA

*vs.*

ROBERTO GUSTAVO CORTES RIPALDA, FERNANDO HABERER
BERGSON AND ERNESTO HERACLITO WEISSON PAZMINO

Defendants.

---

# INDICTMENT

(T. 18, U.S.C., §§ 982(a)(1), 982(a)(2), 982(b)(1), 1349, 1956(h) and 3551
et seq.; T. 21, U.S.C., § 853(p))

---

*A true bill.*

_____ *Foreperson*

*Filed in open court this* _____ *day of* _____ *A.D. 20* _____

_____ *Clerk*

*Bail, S* _____

---

*David Gopstein and Benjamin Weintraub, Assistant U.S. Attorneys*
*(718) 254-6153/6519*
*Shaunik R. Panse, John Scanlon and Randall Warden, Trial Attorneys,*
*Department of Justice*
*(202) 262-7620, (202) 353-4470 and (202) 598-2802*